## Case No. 13,680.

### SWAT v. UNITED STATES.

[Hoff. Land Cas. 230.] [1]

District Court, D. California. June Term, 1857.

MEXICAN LAND GRANTS—PETITION TO COMMISSIONERS—NEGLECT TO PROSECUTE—LIMITATION —HOW EVIDENCE TAKEN.

1. Where a claimant for land has presented his petition to the board of land commissioners, but has neglected to support it by evidence within two years thereafter, such neglect does not bring the claim within the limitation prescribed in the thirteenth section of the act of March 3, 1851 [9 Stat. 633].

---

[1] [Reported by Numa Hubert, Esq., and here reprinted by permission.]

2. Whether this court can proceed to decide such claim solely on evidence taken by its order, left an open question.

3. The claim rejected as fraudulent.

Claim [by George Swat] for three leagues of land on the Sacramento river [called the Rancho Nueva Flandria], rejected by the board, and appealed by the claimant.

E. O. Crosby, for appellant.

P. Della Torre, U. S. Atty., and Peyton & Duer, for appellees.

HOFFMAN, District Judge. The petition in this case was presented to the board February 28th, 1853. No evidence whatever, either oral or documentary, was introduced by the claimant before the board, and the claim was accordingly rejected, March 27th, 1855. The original documents on which the claim is founded, as well as the oral testimony in support of them, are for the first time submitted to this court, under its general rules authorizing "further testimony" to be taken in this class of cases. It may well be doubted whether the claimant has not, according to the letter as well as the spirit of the act of 1851, forfeited whatever rights he had to the land now claimed by him. The eighth section of that act requires "all persons claiming lands by virtue of any right or title derived from the Mexican or Spanish governments, to present the same to the commissioners, together with such documentary evidence and testimony of witnesses as the claimant relies on to support his claim." When the decision of the board comes up for review in this court, the tenth section requires a decree to be rendered "on the pleadings and evidence, and on such further evidence as may be taken by order of this court." The thirteenth section provides that all lands the claims to which shall not have been presented to the board within two years after the date of the act, shall be considered public lands, etc.

The first question to be considered is—was this claim "presented" to the commissioners within the provisions of the eighth and thirteenth sections? If not, it is barred, and the land must be deemed to be part of the public domain. The eighth section requires, as we have seen, that a party claiming land under any right or title derived from the Mexican or Spanish governments shall present the "same." This would, in strict grammatical construction, be taken to mean the "right or title" previously mentioned. But it cannot mean the grant itself, for the statute proceeds to say "together with the documentary evidence and testimony of witnesses" on which he relies. He is thus required to present both his title or right and also the documentary evidence of it. If then he has presented a petition, claiming the land, he would seem to have complied with one of the requirements of the law. The thirteenth section in effect

bars all claims which shall not have been presented within the two years prescribed. But as section eight evidently discriminates between the claim and the documentary evidence in support of it, it would seem that the omission to present the latter would not, within the thirteenth section, constitute an omission to present the former. I think, therefore, that the "claim" was presented within the period limited by the statute, and that the board would have been authorized to receive evidence in support of it, though offered after the expiration of the two years.

The second and more difficult question is—can this court proceed to decide this claim upon the evidence taken in this court, none whatever having been submitted to the board? If this evidence is properly before the court, the case must be determined upon it. The inquiry then is—does the law or the rule of court in pursuance of it authorize evidence to be taken in this court where none has been taken by the board? The language of the tenth section is "the court shall proceed to render judgment upon the pleadings and evidence in the case, and upon such further evidence as may be taken by its order." The term "further" seems to indicate that the evidence ordered to be taken shall be additional evidence, and that some evidence shall already have been taken. The rule of court provides, not that the party shall be allowed to produce testimony in the case, but that he may take additional testimony; and certainly both congress and the court contemplated that such additional testimony should be taken to supply defects and omissions, to corroborate or rebut, and not that it should constitute the whole proofs in the case. It is clear from all the provisions of the act, that the jurisdiction intended to be conferred on this court was in its nature an appellate jurisdiction, or a power to review the decisions of the board. The case as presented to the board is to be reviewed in this court, and the decision is to be rendered upon the evidence submitted to the board, and such further testimony as the court may order. But if the claimant, disregarding the positive requirements of the eighth section, is permitted to withhold all his evidence, both oral and documentary, until he reaches this court, the functions of this court become in effect original and not appellate.

In cases of appeal from the district to the circuit courts in admiralty, additional testimony may be taken in the latter court. But if a libel were filed in the district court, no testimony whatever offered in support of it, and thereupon dismissed, the libellant would hardly be allowed in the circuit court, for the first time, to enter upon his proofs. If such a proceeding were permitted, it would be easy to evade the provisions of law which give to the district court exclusive original cognizance of admiralty suits, and to the circuit courts only an appellate

jurisdiction. But the jurisdiction of this court in land cases, though called an appellate jurisdiction, and though the proceeding by which the decision of the board is reviewed is spoken of as "an appeal," and though bearing a close analogy to an appeal in admiralty or equity suits, has yet been decided to be an original proceeding; the removal of the transcript of the papers and evidence into this court "being but a mode of providing for the institution of suit in this court." U. S. v. Ritchie, 17 How. [58 U. S.] 534. It is to be remembered, however, that this view of the nature of the proceeding in this court was taken by the supreme court to meet the objection that the law authorizing an "appeal" from the decision of the board was unconstitutional. The latter not being "a court" under the constitution, the case when presented to the district court becomes for the first time a suit or case before a "court," and in this sense the jurisdiction of the court was said to be original. But the mode of exercising that jurisdiction is exactly analogous to the mode of exercising an appellate jurisdiction, and the proceeding is practically, though not technically, an appeal. When, therefore, congress has directed that this case shall be determined upon evidence taken before another tribunal, not a court, but certified up to this court to be used as evidence, and also on further evidence to be taken by order of this court, the question still recurs whether this court can, where no testimony has been certified to it, permit all the testimony on which its decision is to be founded to be taken as "further testimony."

The answer to this question depends on the force we attach to the word "further." If the construction contended for by the United States be adopted, the court would still be at liberty to order further testimony to be taken in all cases where any testimony whatever had been taken by either side before the board. Suppose then, that the testimony so taken by a claimant is wholly irrelevant, or immaterial, or even adverse to him, shall he be in a better position in this court than one who by accident or neglect of agents or counsel has been unable or has omitted to produce any testimony? It would hardly occur to the claimant under such circumstances that he could save his rights in this court by examining before the board a witness who knew nothing about his claim, or who would testify that he had no title.

Again: If the strict and literal construction of the term "further" be adopted, it might with some plausibility be urged that the testimony must be additional to some testimony already taken by the party seeking to introduce it. Suppose then, the United States have been wholly unable to procure any evidence before the board to establish a suspected fraud. When the case is in this court conclusive evidence is for the first time discovered. Shall they be pre-

vented from introducing it because they have offered no testimony to the commissioners?

It is unnecessary, however, to pursue this subject further. On the whole, I incline to the opinion that the intention of congress was to allow testimony on either side to be taken in this court; that the word "further" was used because it was taken for granted that the claimants would in all cases comply with the directions of the eighth section, and offer some testimony to the board; but that it was not intended to provide for the rare and exceptional case where they had totally omitted to do so, nor absolutely to restrict the power of the court to those cases where in strictness of language the testimony could be deemed "further testimony." In the present case, however, it is not necessary finally to decide the point. It is to be considered, therefore, as still open to discussion in this court. We proceed to consider the merits of this case.

The title of the appellant is claimed under what is known as the general title of Micheltorena. The question to be determined is one of fact—Was the claimant one of those in whose favor the general title issued? The persons to whom the governor authorized General Sutter to deliver a copy of the general title were those who had petitioned for lands, with a favorable informe by the latter, previous to December 22d, 1844, the date of the general title. If therefore, it appears that previous to that date the claimant had petitioned for his land, procured a favorable informe from Sutter, and obtained a copy of the general title from him, he is, according to the ruling of this court, entitled to a confirmation of his claim. In support of his claim an original petition to Governor Micheltorena, dated November 13th, 1844, is produced, with a marginal informe by Gen. Sutter of the same date, together with a copy of the general title, and a certificate signed by Sutter that it was delivered to Juan de Swat on the twenty-fifth of April, 1845. It is contended that no petition was ever presented to the governor; that the petition now produced was made November 3d, 1845; that its date has been altered to November 13th, 1844, and the favorable informe of Gen. Sutter, dated November 13th, 1844, recently written in the margin. The present claimant is the brother and heir of Juan de Swat, the alleged original grantee. During his lifetime Juan de Swat conveyed his interest in a part of the lands to Warner, by whom a claim was presented to the board through his attorneys Messrs. Kewen & Morrison. It is shown that Juan de Swat delivered to Warner his title papers. And copies of the papers as presented in the Warner case are in evidence in this cause. Mr. Morrison, one of the attorneys of Warner, testifies that he had in his possession the original papers in the case, viz: the petition of Swat to the alcalde, De la Rosa, with the marginal indorsements of that officer and of Sutter, the petition to the governor and the map accompanying it. That he delivered all these papers to Mr. Crosby, the attorney for the present claimant. It is also shown that Swat himself stated that Messrs. Kewen & Morrison had his original papers, which is further corroborated by the fact that Swat and Warner conveyed to Kewen & White an interest in part of the land as a compensation for their professional services. A copy of the petition to the governor is produced and admitted to be in the handwriting of Mr. Kewen. This copy was delivered with the other papers to Mr. Crosby by Mr. Morrison.

On examining the copies of the papers filed in the Warner case, the originals of which were, as has been stated, delivered to Mr. Crosby after the Warner case was rejected and abandoned, we find them to correspond in every respect with the papers now produced, except in three vital particulars: The map has no date, while that now produced has the figures "1844" upon it. The petition to the governor is dated November 3d, 1845, instead of November 13th, 1844; and there is no favorable informe of General Sutter on its margin. That a map without the date of 1844, that a petition to the governor dated November 3d, 1845, and having no marginal informe by Sutter, were presented in the Warner case, cannot be doubted; and that those papers were delivered to Mr. Crosby, is equally clear. If the papers now produced be not those papers which have since been altered, where are they? And whence have the papers now produced been obtained? No explanation on these points is offered on the part of the claimant, nor is any reason suggested why Warner & Swat, who are shown to have given the papers to Messrs. Kewen & Morrison, should have withheld from them the only papers by which the claim could be established. That Messrs. Kewen & Morrison had no papers bearing the dates of those now presented is clear; and the copy of the petition to the governor made by Mr. Kewen and handed with the other papers to Mr. Crosby, is dated like that filed in the Warner case, November 3d, 1845, and not November 13th, 1844.

On examining the petition now produced we recognize the facility with which an alteration of its date could be made. Numerous experts have testified that they discover the marks of the supposed alteration by the insertion of the figure one before the three in the date of the day, and the change of the number of the year from 1845 to 1844. I cannot say that I have been able myself to detect these alterations, although there is evidently something unnatural in the appearance of the figures, which suggests the possibility of their having been changed.

One indication is extremely suspicious, the ordinary English affix "th" is placed after and above the figures "13," which certainly would not have been done by a person writing a document in Spanish. But the moral evidence afforded by the circumstances of this case is stronger than any furnished by the mere appearance of the documents. Before we can believe the petition now presented to be genuine, we must suppose that two petitions to the governor were drawn, the one dated November 13th, 1844, the other November 3d, 1845. That they were not merely similar in purport but identical in every particular, except the date. That when the title papers were furnished to counsel for the purpose of establishing the claim, only one of them was delivered with the other papers; that the other, on which alone the claim could be substantiated, was withheld. That neither they suspected, nor their clients advised them during the whole proceeding, of the existence of any other petition than that furnished. That the second petition has recently, and after the cause had been pending two years before the board, and after the claim had been rejected, been suddenly produced we know not whence, while the first petition has disappeared we know not whither; and, finally, that the unfortunate coincidence has occurred that the second petition presents, if not unmistakeable marks of alteration, at least an equivocal and suspicious appearance. A series of suppositions so improbable and extravagant cannot, without the clearest proof, be entertained. The testimony of Mr. Bidwell is relied on by the claimant to explain some of the circumstances of the case. But the evidence of this witness tends to corroborate rather than to weaken our suspicions. It is clear from his statements that in the fall of 1845, or spring of 1846, he did prepare a petition and map for Swat, but was evidently prevented from presenting them to the governor. But the previous petition of November 13th, 1844, he cannot recollect. That purporting to bear that date he recognizes as in his handwriting, and he presumes from its date and from the date of the map, that he drew it at the time it bears date. His opinion is thus derived entirely from the dates of the documents, and the question whether those dates have been altered is the very point in controversy.

But, in addition, it is admitted that on the seventh of October, 1845, Swat petitioned the alcalde of Sonoma for permission to occupy the land in question for the security of his cattle and horses. That this petition was referred to Gen. Sutter, who reported on the thirty-first of October, 1845, that the land was vacant. And yet if the documents now produced are genuine, he had on the thirteenth of November preceding petitioned the governor for the same land, with a favorable report by Sutter, and the latter had,

as authorized by the general title, delivered to him a copy of that document on the twenty-fifth of April, 1845. At the very time then at which he asks for permission to occupy a piece of land for the security of his cattle, and at which Sutter certifies that it is vacant, and for six months previously, he had received from Sutter himself what was then regarded and what has since been considered by this court as a good title to the land.

Again: If at the time the petition of 1845 was drawn, Swat had already presented a precisely similar petition, with a favorable report of Sutter, on which the latter had given him a copy of the general title, those papers must have been in his possession. It is certainly surprising that Mr. Bidwell, who was conversant with the mode of obtaining grants, should have totally forgotten such important documents, and should, when drawing the petition of 1845, have omitted all mention of the previous petition of 1844, drawn by himself, on which was written Sutter's favorable report, and on which Swat had already obtained a copy of the general title. That it must have been before him when he drew the petition of 1845 is evident from the fact that the one is a literal transcript of the other, and that they only differ in their dates.

If the object of the second petition of Swat was merely to procure the "extension of his title in proper form," as promised in the general title of Micheltorena, the nature of the application was essentially different from an ordinary petition for lands; and yet in his second petition he merely asks for "the vacant land" on the Sacramento river, and gives its boundaries, etc., in the usual form, while he wholly omits to mention the facts which constituted the foundation of his application. It is not conceivable that Mr. Bidwell should, under such circumstances, have contented himself with copying the first petition, and should now have lost all recollection of so singular a proceeding. If to all these considerations be added the facts that the petition of the present claimant to the board omits to mention the date of the petition to the governor, or Sutter's favorable report upon it; that no one of the numerous attorneys who have been concerned in the case, or of the persons who have examined the papers, has ever seen such papers as are now produced; that if this petition be not the petition of 1845, with its date altered, that paper has suddenly and unaccountably disappeared simultaneously with the equally unexplained appearance of the present petition; that Swat repeatedly declared to numerous witnesses that his title consisted of the "alcalde papers, and that he had been too late in his application to the governor"; and, finally, that the present claimant, in a deed dated July, 1855, refers to the petition of Swat to the governor as made on Novem-

ber 3d, 1845, showing that even so late as 1855 the existence of the petition of 1844 was wholly unknown to him,—the conclusion is irresistible, that no petition dated November 13th, 1844, was ever presented to the governor or prepared by Bidwell, and that the document now presented is the petition of November 3d, 1845, the date of which has been fraudulently altered, and on which the marginal endorsement of Gen. Sutter has since been written. There is some testimony which would, if admitted, confirm this view of the facts. I have not thought it necessary, however, to decide upon the question of its admissibility, for upon the evidence above referred to I entertain no doubt as to the facts of the case. The claim must be rejected.